# UNITED STATES DISTRICT COURT
## NORTHERN DISTRICT OF INDIANA

| | | |
|---|---|---|
| DAN FRANKLIN, VIVIAN FRANKLIN, | ) | |
| and DESHAWN FRANKLIN, | ) | |
| | ) | |
| Plaintiffs, | ) | |
| | ) | |
| v. | ) | CAUSE NO.: 3:13-CV-207-TLS |
| | ) | |
| CIVIL CITY OF SOUTH BEND, PETE | ) | |
| BUTTIGIEG, Mayor, CHARLES HURLEY, | ) | |
| Interim Chief of Police of the South Bend Police | ) | |
| Department, ERIC MENTZ, Patrolman, | ) | |
| PFC MICHAEL STUK, and OFFICER AARON | ) | |
| KNEPPER, | ) | |
| | ) | |
| Defendants. | ) | |

## OPINION AND ORDER

The Plaintiffs, Dan Franklin, Vivian Franklin, and DeShawn Franklin, have sued the

Defendants for events that occurred on July 7, 2012. Dan and Vivian Franklin are the parents of

DeShawn Franklin. Around 2:30 AM, the Defendant police officers entered the Plaintiffs'

residence looking for the Franklins' older son, Dan Jones, who they believed had just committed

a battery on his girlfriend before fleeing to his mother's house. Jones was not inside the house.

But the police, mistakenly believing that a sleeping DeShawn was actually Jones, seized him.

Only after officers subdued the resisting DeShawn through the use of physical force did they

realize that he was not the person they were looking for. They detained him further before

deciding that he should not be charged with resisting arrest or battery.

The Plaintiffs filed a twelve-count Complaint at Law [ECF No. 1] in the St. Joseph

Circuit Court, raising claims for violations of the First, Fourth, Fifth, and Fourteenth

Amendments through 42 U.S.C. § 1983, along with state claims for trespass, battery, false arrest,

false imprisonment, negligence, negligent supervision, and assault. In addition to suing Officers

Eric Mentz, Michael Stuk, and Aaron Knepper, the Plaintiffs raised claims against Defendant

Civil City of South Bend (South Bend); Defendant Pete Buttigieg, Mayor of South Bend, and;

Defendant Charles Hurley, Interim Chief of Police of the South Bend Police Department. The

Complaint was removed to this Court.

Pursuant to an Opinion and Order [ECF No. 19] issued on September 19, 2013, the

Plaintiff's fourth cause of action for invasion of privacy, and the fifth cause of action for failure

to protect are no longer pending against South Bend, Buttigieg, and Hurley. Defendants Mentz,

Stuk, and Knepper have moved for summary judgment [ECF No. 36] on all claims brought

against them.


## STATEMENT OF FACTS

The following facts are derived solely from the case reports written by officers Eric

Mentz, Michael Stuk, and Aaron Knepper. The only other evidence offered, a document entitled

"Internal Affairs Investigation Report," has not been authenticated. *See* Fed. R. Evid. 901(a)

("the proponent must produce evidence sufficient to support a finding that the item is what the

proponent claims it is"). Because the proponent of the document, the Plaintiffs, do not provide an

affidavit from the author of the report or custodian of the document concerning its authenticity, it

is not admissible. *Article II Gun Shop, Inc. v. Gonzales*, 441 F.3d 492, 496 (7th Cir. 2006); *Scott

v. Edinburg*, 346 F.3d 752, 760 n.7 (7th Cir. 2003). In any event, the contents of the report

cannot be used for the purpose the Plaintiffs attempt to present it, which is to offer legal

conclusions about the officers' actions.

On July 7, 2012, at 2:23 AM, Officer Mentz responded to a domestic violence complaint.

The victim, Crystal Escobedo, told Officer Mentz that her boyfriend, Dan Jones, caused what Officer Mentz reported were "ghastly bite marks." (ECF No. 36-2 at 2.) Escobedo told Officer Mentz that Jones had already left and was going to his mother's house at 910 Bowman Street. Officer Mentz relayed this information to Officer Knepper, who intended to look for Jones while Officer Mentz continued to talk with Escobedo. Officer Mentz told Officer Knepper that Jones was to be arrested on felony assault charges.

Officer Knepper saw a man jog across a street toward the 1000 block of Bowman and contacted Officer Mentz by radio. Officer Knepper confirmed with Officer Mentz that Jones was a black male, about 5'5", 140 pounds, and had braided hair. Officer Knepper turned his car around to pursue the man he believed to be Jones, but lost sight of him. Another officer, Officer Stuk, arrived to set up a perimeter. A fourth officer, who had a K-9, began tracking in the alley where Officer Knepper last saw the man fitting Jones's description. The K-9 led officers to the back of a house about two blocks away. The address was 910 Bowman Street.

Officer Knepper asked dispatch to call the occupants of 910 Bowman Street and direct them to step out of the house. Dispatch advised that the female who answered the phone said that she lived on Fellow Street, that she was not making any sense, and that she was changing her story. Officers Mentz and Stuk knocked on the front door of 910 Bowman Street. Vivian Franklin answered the door. Officer Stuk had her step outside and asked her who else was in the house. She responded that her husband and her son were inside. Officer Stuk looked over to Officer Mentz, shrugged his shoulders, and nodded his head. Officer Mentz took this to mean that they should proceed inside the house.

Officers Mentz and Knepper entered the house. Officer Stuk stayed outside with Vivian

just until the K-9 officer could stay with her instead. All three officers entered a bedroom and saw a black male laying face down on the bed. Officer Knepper saw that he had braids, but that his clothes were not the same clothes Jones had been wearing earlier. The officers suspected that it was Jones pretending to be asleep, and began giving him verbal commands.

When verbal commands failed to elicit any response, Officer Mentz attempted to handcuff the male, who the officers only later discovered was not Jones and was, instead, his younger brother DeShawn. Because DeShawn had been sleeping, Officer Mentz's actions caused DeShawn to jump up and become combative. He lunged at Officer Mentz, grabbing his vest and gun belt. To subdue DeShawn, Officer Knepper used his taser, but only one probe struck him. Officer Mentz then hit DeShawn three times in the face until he released his grip on Officer Mentz's vest and belt. Officers Mentz and Stuk forced DeShawn onto the bed as Officer Knepper attempted to put his left arm behind his back to detain him. DeShawn continued to struggle and Officer Knepper struck him in the shoulder blade area three times with his fist. Officer Knepper was then able to gain control of DeShawn's arm and place it behind his back while Officer Mentz handcuffed him. DeShawn was escorted outside and secured in Officer Struk's police vehicle.

By then, Officer Knepper knew that DeShawn was not Jones, however, the officers detained DeShawn for battery of an officer and resisting arrest. After reviewing the events, DeShawn was released and treated by paramedics for removal of the taser probe.

## ANALYSIS

This Court will only grant summary judgment if all of the admissible submissions

indicate that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 247 (1986); Fed. R. Civ. P. 56(a). The court's role in deciding a motion for summary judgment "is not to sift through the evidence, pondering the nuances and inconsistencies, and decide whom to believe. The court has one task and one task only: to decide, based on the evidence of record, whether there is any material dispute of fact that requires a trial." *Waldridge v. Am. Heochst Corp.*, 24 F.3d 918, 920 (7th Cir. 1994). A district court should deny a motion for summary judgment only when the non-moving party presents admissible evidence that creates a genuine issue of material fact. *Luster v. Ill. Dep't of Corrs.*, 652 F.3d 726, 731 (7th Cir. 2011) (citing *United States v. 5443 Suffield Terrace*, 607 F.3d 504, 510 (7th Cir. 2010); *Swearnigen–El v. Cook Cnty. Sheriff's Dep't*, 602 F.3d 852, 859 (7th Cir. 2010)). Material facts are those that are outcome determinative under the applicable law. *Smith v. Severn*, 129 F.3d 419, 427 (7th Cir. 1997). Additionally, a court is not "obliged to research and construct legal arguments for parties, especially when they are represented by counsel." *Nelson v. Napolitano*, 657 F.3d 586, 590 (7th Cir. 2011).

### A.      Constitutional Claims

When public officers violate the constitutional rights of citizens, 42 U.S.C. § 1983 provides the vehicle for a legal claim. But the Defendants have asserted that they are entitled to qualified immunity, which is a doctrine that protects government officials "from liability for civil damages insofar as their conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known." *Harlow v. Fitzgerald*, 457 U.S. 800,

818 (1982) (citations omitted). Qualified immunity is intended to strike a balance between "protect[ing] a government official's ability to function without the threat of distraction and liability" and "afford[ing] members of the public the ability to vindicate constitutional violations by government officials who abuse their offices." *Gibbs v. Lomas*, 755 F.3d 529, 537 (7th Cir. 2014) (internal quotation marks and citations omitted). Evaluating a qualified immunity defense requires two inquires: (1) whether the facts, taken in the light most favorable to the plaintiffs, make out a violation of a constitutional right, and (2) whether that constitutional right was clearly established at the time of the alleged violation. *Williams v. City of Chi.*, 733 F.3d 749, 758 (7th Cir. 2013) (citation omitted). "If *either* inquiry is answered in the negative, the defendant official is entitled to summary judgment." *Gibbs*, 755 F.3d at 537. The Court is not required to address the prongs in order. *Pearson v. Callahan*, 555 U.S. 223, 236 (2009).

1. *Entry Into the Plaintiffs' Home and Seizure of DeShawn*

It is undisputed that the Defendant officers entered the Plaintiffs' home and seized DeShawn, and did so without a warrant or consent. "At the core of the privacy protected by the Fourth Amendment is the right to be let alone in one's home." *Sutterfield v. City of Milwaukee*, 751 F.3d 542, 550 (7th Cir. 2014). The Fourth Amendment thus "'prohibits the police from making a warrantless and nonconsensual entry into a suspect's home in order to make a *routine* arrest,' even for a felony, and even with probable cause." *Hawkins v. Mitchell*, 756 F.3d 983, 992 (7th Cir. 2014) (ellipses omitted) (quoting *Payton v. New York*, 445 U.S. 573, 576 (1980)); *cf. Steagald v. United States*, 451 U.S. 204, 214–15 (1981) (holding that police may not lawfully enter the home of a third party to search for a person named in an arrest warrant without first

obtaining a search warrant). The protections of the Fourth Amendment extend to warrantless

arrest inside a person's home, which is to say that police officers may not execute a warrantless

arrest in a home unless they have both probable cause and exigent circumstances. *See, e.g.*,

*Payton*, 445 U.S. at 586 ("It is a 'basic principle of Fourth Amendment law' that searches and

seizures inside a home without a warrant are presumptively unreasonable."); *Welsh v. Wisconsin*,

466 U.S. 740, 749 (1984) ("[W]arrantless . . . arrests in the home are prohibited by the Fourth

Amendment, absent probable cause and exigent circumstances.").

"Nevertheless, because the ultimate touchstone of the Fourth Amendment is

'reasonableness,' the warrant requirement is subject to certain exceptions." *Brigham City, Utah

v. Stuart*, 547 U.S. 398, 403 (2006). "Before agents of the government may invade the sanctity of

the home, the burden is on the government to demonstrate exigent circumstances that overcome

the presumption of unreasonableness that attaches to all warrantless home entries." *Welsh*, 466

U.S. at 750. "[A] warrantless entry into a dwelling may be lawful when there is a pressing need

for the police to enter but no time for them to secure a warrant." *Sutterfield*, 751 F.3d at 557

(*citing Michigan v. Tyler*, 436 U.S. 499, 509 (1978), and *Fitzgerald v. Santoro*, 707 F.3d 725,

730 (7th Cir. 2013)). The underlying pragmatic concern is "whether the exceedingly strong

privacy interest in one's residence is outweighed by the risk that delay will engender injury,

destruction of evidence, or escape." *United States v. Acevedo*, 627 F.2d 68, 70 (7th Cir. 1980).

The first question the Court asks then, is whether the Defendants had an objectively

reasonably belief that there was an "urgent need to cross the threshold," of the Plaintiffs' home

*Acevedo*, 627 F.3d at 70, so that they could find the person they believed was inside and arrest

him for recently committing a battery on his girlfriend at a different location. The Defendants

claim that they were so justified because they were in "hot pursuit" of a fleeing suspect. *See United States v. Santana*, 427 U.S. 38, 42–43 (1976). They assert that "the interest in finding a person who committed an act of violence and is evading police intervention outweighs any inconvenience the [Plaintiffs'] claim in their constitutional right." (Mem. in Support 8, ECF No. 36-1.)

The Supreme Court first upheld a warrantless entry and search in light the "exigencies of the situation" brought about by circumstances involving pursuit in *Warden v. Hayden*, 387 U.S. 294 (1967). The Court held:

> The police were informed that an armed robbery had taken place, and that the suspect had entered [a certain house] less than five minutes before they reached it. They acted reasonably when they entered the house and began to search for a man of the description they had been given and for weapons which he had used in the robbery or might use against them. The Fourth Amendment does not require police officers to delay in the course of an investigation if to do so would gravely endanger their lives or the lives of others. Speed here was essential, and only a thorough search of the house for persons and weapons could have insured that Hayden was the only man present and that the police had control of all weapons which could be used against them or to effect an escape.

*Warden*, 387 U.S. at 298–99. This Court is using the term pursuit loosely in connection with *Warden*, as it is aware that the majority opinion did not actually use the term "hot pursuit." Those words appear only in the concurring and dissenting opinions. In a later decision, the Supreme Court noted in a footnote that *Warden* was actually based on the "exigencies of the situation," and did not "even involve a 'hot pursuit' in the sense that the term would normally be understood," as there was no element of a chase. *Santana*, 427 U.S. at 42 n.3.

In *United States v. Santana*, the case cited by the Defendants in support of their warrantless entry, an undercover officer arranged to buy heroin from an individual who obtained the drugs from inside Santana's house. Thus, immediately after the crime had been committed,

8

police officers had probable cause to arrest Santana, but no warrant. They saw her standing outside her open doorway as they approached the house. When they shouted "police," Santana retreated into her home. The police followed her inside and arrested her. After concluding that Santana was in a "public place" when they first encountered her, so that the police were clearly justified in attempting to arrest her without a warrant, the Court explained:

> The only remaining question is whether her act of retreating into her house could thwart an otherwise proper arrest. We hold that it could not. . . . This case, involving a true "hot pursuit," is clearly governed by *Warden*; the need to act quickly here is even greater than in that case while the intrusion is much less. The District Court was correct in concluding that "hot pursuit" means some sort of a chase, but it need not be an extended hue and cry "in and about (the) public streets." The fact that the pursuit here ended almost as soon as it began did not render it any the less a "hot pursuit" sufficient to justify the warrantless entry into Santana's house. Once Santana saw the police, there was a realistic expectation that any delay would result in destruction of evidence.

*Santana*, 427 U.S. at 42–43 (footnote cited above omitted).

In *Welsh v. Wisconsin*, decided eight years after *Santana*, the Supreme Court found that the government had not met the heavy burden of showing that an urgent need justified a warrantless home arrest. A witness had observed a car swerve off the road and come to a stop in an open field. After the witness blocked the car from returning to the road, the driver emerged from the vehicle and asked for a ride home. When the witness suggested they wait for assistance, the driver walked away from the scene. 466 U.S. at 742. The police arrived a few minutes later and questioned the witness. They also located the vehicle registration of the abandoned car and learned that it was registered to Welsh, who lived a short distance from the scene. The police proceeded to Welsh's home where they gained entry after a family member answered the door. *Id.* at 743. The officers found Welsh lying in bed and arrested him for driving or operating a motor vehicle while under the influence of an intoxicant. The government attempted to "justify

the arrest by relying on the hot-pursuit doctrine, on the threat to public safety, and on the need to preserve evidence of the petitioner's blood-alcohol level." *Id.* at 753. In disposing of the hot pursuit argument, the Court stated that it was "unconvincing because there was no immediate or continuous pursuit of the petitioner from the scene of a crime." *Id.*

The Court has reviewed the designated evidence and applied the facts most favorable to the Plaintiffs to the pertinent case law. Having done so, the Court finds that genuine issues of material fact preclude the Court from finding as a matter of law that it was reasonable for the police officers, in light of the circumstances they faced, to believe that there was a compelling need to act and no time to obtain a warrant.

The Defendants urge the Court to consider the nature of the offense—describing it as a violent attack. The record reveals that Officer Mentz was dispatched to a residence in reference "to a domestic." (Mentz Case Supp'l Report, ECF No. 36-2 at 2.) According to Officer Mentz, the victim, "had suffered some ghastly bite marks from her boyfriend Dan Jones." (*Id.*) Although the nature of the offense may be a factor in the exigency analysis, it is not instructive as to whether the officers were in hot pursuit of Jones for committing that offense. *See, e.g.*, *Stanton v. Sims*, 134 S. Ct. 3, 6 (2013) (noting that whether a crime was a felony or a misdemeanor was separate inquiry from whether police were in hot pursuit). The officers responded to a domestic disturbance call to learn that Jones had already left the scene. The officers attempted to locate Jones based on the victim's statement that he was going to his mother's residence. One of the officers saw Jones jogging in the direction of the house, but lost sight of him and did not regain a visual of Jones at any point before entering the house. A K-9 tracked Jones's scent to the back door of his mother's house (a place he presumably visited at some time but not necessarily that

night). These circumstances may describe a pursuit of a suspect, but they do not describe one that was "immediate and continuous . . . from the scene of the crime." *See Welsh*, 466 U.S. at 753. And as the police did not first attempt to arrest Jones while he was in a public place, this case is unlike *Santana's* continuation of a legitimate doorway arrest.

Absent a true "hot pursuit," there is little exigency to justify the officers' actions. Although no categorical rule was announced in *Welsh*, the Court did state that, in situations where only a minor offense has been committed, "application of the exigent-circumstances exception in the context of a home entry should rarely be sanctioned." *Welsh*, 466 U.S. at 753. What can be gleaned from the record is that Jones bit his girlfriend. The Defendants attempt to bolster the justification for their actions by arguing in their Memorandum in Support of summary judgment that they "remained uncertain if Jones was armed." (Mem. 6, ECF No. 36-1; *see also id.* at 8 (stating that the officers "were uncertain whether Jones was in the house or if he was armed").) But there is no indication that Jones's offense involved a firearm or other dangerous weapon, that he had used such a weapon in the past, or that he had access to such a weapon, and the Court cannot assume that the officers had an objective reason to be concerned. *See* Fed. R. Fed. P. 56(c) (stating that a party must support an assertion of fact by "citing to particular parts of materials in the record"). Additionally, the Defendants had no reason to believe that Jones could destroy any evidence (having used his teeth on the victim), which was a legitimate concern in *Santana* when the suspect retreated inside her house from a public place after completing a drug deal. Nor was there reason to believe that Jones posed a danger to his family inside the house or to the police officers outside the house. The officers have not presented any evidence to suggest that they were concerned that Jones was planning an escape or a return to his girlfriend,

or that he would be able to escape the house undetected with their perimeter in place. *Cf. Warden*, 381 U.S. at 298–99 (police justified because delay would have "gravely endanger[ed] their lives or the lives of others," or that "only a thorough search of the house for persons and weapons could have insured that [the robber] was the only man present and that the police had control of all weapons which could be used against them or to effect an escape").

The only other reason, in addition to the nature of the offense, the Defendants have offered thus far for bypassing the constitutional requirement of a warrant is that Jones was attempting to evade arrest. This fact, however, hardly seems unique to criminal suspects and, thus, is not an appropriate justification for the warrantless entry. The Supreme Court, explaining that search warrants are not a mere formality, but serve a "high function," has stated:

> Absent some grave emergency, the Fourth Amendment has interposed a magistrate between the citizen and the police. This was done not to shield criminals nor to make the home a safe haven for illegal activities. It was done so that an objective mind might weigh the need to invade that privacy in order to enforce the law. The right of privacy was deemed too precious to entrust to the discretion of those whose job is the detection of crime and the arrest of criminals. Power is a heady thing; and history shows that the police acting on their own cannot be trusted. And so the Constitution requires a magistrate to pass on the desires of the police before they violate the privacy of the home. We cannot be true to that constitutional requirement and excuse the absence of a search warrant without a showing by those who seek exemption from the constitutional mandate that the exigencies of the situation made that course imperative.

*McDonald v. United States*, 335 U.S. 451, 455–56 (1948). In *Mincey v. Arizona*, 437 U.S. 385 (1978), the Court warned that "the mere fact that law enforcement may be made more efficient can never by itself justify disregard of the Fourth Amendment." 437 U.S. at 393 ("[T]he Fourth Amendment reflects the view of those who wrote the Bill of Rights that the privacy of a person's home and property may not be totally sacrificed in the name of maximum simplicity in enforcement of the criminal law.").

The record developed thus far reveals genuine issues surrounding whether the warrantless entry was a matter of exigency, or was simply the more efficient course of action. A reasonable jury, considering the facts most favorable to the Plaintiffs, could conclude from the current record that there were no exigencies that rendered it unreasonable for the Defendants to obtain a warrant, and that their failure to do so violated the Plaintiffs' Fourth Amendment rights. Accordingly, the first inquiry of the qualified immunity analysis does not favor the Defendants. Next, the Court considers whether the Fourth Amendment right at issue was clearly established at the time of the incident.

"To be 'clearly established,' the right in question must be 'sufficiently clear that a reasonable official would understand that what he is doing violates that right. This is not to say that an official action is protected by qualified immunity unless the very action in question has previously been held unlawful; but it is to say that in the light of pre-existing law the unlawfulness must be apparent.'" *Miller v. Jones*, 444 F.3d 929, 934 (7th Cir. 2006) (quoting *Anderson v. Creighton*, 483 U.S. 635, 640 (1987)). Courts "do not require a case directly on point, but existing precedent must have placed the statutory or constitutional question beyond debate." *Ashcroft v. al-Kidd*, 131 S. Ct. 2074, 2083 (2011).

No reasonable officer could claim to be unaware of the general rule, well established by the Supreme Court, that, absent consent or exigency, a warrantless search of the home is presumptively unconstitutional. *See Payton*, 445 U.S. at 586–88; *see also Steagald*, 451 U.S. at 214–15 (holding that police cannot personally determine when there is sufficient justification for searching the home of a third party for the subject of an arrest warrant, in the absence of exigent circumstances, any more than they can justify warrantless entry to search for objects). Turning to

the specific context of this case, the Court finds that the law was sufficiently clear to make it apparent to the officers that the situation lacked the exigency necessary to justify a warrantless entry.

In 1984, the Supreme Court warned that police "bear a heavy burden when attempting to demonstrate an urgent need that might justify" warrantless entry. *Welsh*, 466 U.S. at 749–50 (explaining that exigent circumstances that may excuse a warrantless entry of a home were "few in number and carefully delineated"). In *Welsh*, the Supreme Court unequivocally rejected the contention that the arresting officers were in hot pursuit of the suspect where the officers arrived at the scene after the suspect had left, and then proceeded to arrest him at his home. *Id.* at 753. Arguably, this case presents some differences—Officer Knepper saw Jones jogging across the street at one point during his canvas of the neighborhood and a K-9 tracked his scent to the house. But there is no precedent to suggest that the eventual and interrupted pursuit could be considered immediate and continuous based on these differences. For example, there is no case to support a belief that the K-9 track is the same as a continuous pursuit by officers. Even if the record were not so sparse on details about the K-9's actions—such as whether it picked up a scent immediately, how long the dog tracked the scent, how old the scent could have been for the dog to still track it, whether the dog went straight to the residence, or whether it stopped only at the residence—the pursuit could not be called continuous under any existing case law.

Additionally, this case presents an added layer that warranted caution. The home the officers entered was not that of the suspect, but that of a third party. None of the facts presented to the Court suggest that the Defendants had reason to believe that the home on Bower Street was Jones's residence. In 1981, the Supreme Court recognized that the availability of telephonic

search warrants minimized the burden of obtaining a search warrant to enter a third person's house to seize a fugitive. *Steagald*, 451 U.S. at 222; *see also* Fed. R. Crim. P. 41(d)(3) (allowing warrant to be obtained based on information "communicated by telephone or other reliable electronic means").

The law was clearly established before the officers acted. This was not a "close case," for which qualified immunity is intended so as to protect "the officer's snap judgment in a legally hazy area." *White v. Stanley*, 745 F.3d 237, 241 (7th Cir. 2014). Rather, based on the circumstances currently before the Court, the Defendants were faced with a scenario that required them to identify a true exigency before invading the privacy of the Plaintiffs inside their home. A jury will be allowed to consider the Plaintiffs' claim that the Defendants violated their Fourth Amendment rights when they entered their home and seized DeShawn.

## 2. *Excessive Force*

The right to make an arrest or investigatory stop necessarily carries with it the right to use some degree of physical coercion or threat thereof to effect it. *Graham v. Connor*, 490 U.S. 386, 396 (1989). In assessing whether an officer's use of force violates the Fourth Amendment, the question is whether the officer's "actions are objectively reasonable in light of the information known at the time of an arrest." *Miller v. Gonzalez*, 761 F.3d 822, 828 (7th Cir. 2014). This question turns on such factors as "the severity of the crime at issue, whether the suspect poses an immediate threat to the safety of the officers or others, and whether he is actively resisting arrest or attempting to evade arrest by flight." *Graham*, 490 U.S. at 396. Courts also consider "whether the citizen was under arrest or suspected of committing a crime, was

armed, or was interfering or attempting to interfere with the officer's execution of his or her duties." *Jacobs v. City of Chi.*, 215 F.3d 758, 773 (7th Cir. 2000). An officer's use of force is unreasonable if in light of all those circumstances at the time of the seizure, the officer used greater force than was reasonably necessary to effectuate the seizure. *Graham*, 490 U.S. at 397.

The Defendants argue that they used no greater force than was "necessary to return safety to them and others in the vicinity to make the eventual arrest of DeShawn." (Defs.' Mem. 11.) The Plaintiffs have not disputed that DeShawn became combative and grabbed Officer Mentz's utility belt and refused to give Officer Knepper his arm. Additionally, nothing in the record provides a reason to questions the Defendants' accounts. It was 2:00 in the morning when DeShawn was awakened in his bed by the officers attempting to force his hands behind his back. A common sense reaction would include "fighting back" against these unknown assailants. Rather than dispute these specific facts, the Plaintiffs assert that the officers "knew that 17 year old DeShawn Franklin was asleep and posed no threat when they struck and tased him thereby using excessive force." (Pls.' Mem. 8, ECF No. 37 (citing *Payne v. Pauley*, 337 F.3d 767, 780 (7th Cir. 2003), for the proposition that "officers do no have the right to shove, push, or otherwise assault innocent citizens without any provocation whatsoever").) Nothing in the designated evidence supports the assertion that the Defendants knew DeShawn was asleep. Rather, all of the designated evidence indicates that the officers believed the person in the bed was Jones, not DeShawn, and that he was only pretending to be asleep when he ignored the officers' commands. Accordingly, there are no genuine disputes regarding DeShawn's active resistance to the Defendants' attempts to seize him, and the immediate threat to the safety of the officers that his reaction posed. Under these circumstances, officers would not have had reason

to believe that their conduct in restoring order and controlling DeShawn was unreasonable.

The Plaintiffs also appear to be relying on pre-seizure conduct to support the excessive force claim. Weaved into the excessive force argument, in fact dominating it, is an analysis about lack of exigencies, which rendered the entry into the home unlawful and led to the seizure of the wrong person—a minor who was asleep in his bedroom and who had committed no crimes. This is essentially an argument that the Defendants are liable for excessive force because they unreasonably created the encounter that led to the use of force against DeShawn. "Pre-seizure police conduct cannot serve as a basis for liability under the Fourth Amendment; [courts] limit [their] analysis to force used when a seizure occurs." *Marion v. City of Corydon, Ind.*, 559 F.3d 700, 705 (7th Cir. 2009). The Seventh Circuit stated recently that its "caselaw is far from clear as to the relevance of pre-seizure conduct, or even as to a determination as to what conduct falls within the designation 'pre-seizure,' although the majority of cases hold that it may not form the basis for a Fourth Amendment claim." *Williams v. Ind. State Police Dep't*, — F.3d —, No. 14-2523, 2015 WL 4772639, at *10 (7th Cir. Aug. 13, 2015). Given this lack of clarity, the court granted qualified immunity to an officer who used deadly force, because he would not have been "on notice that his conduct leading up to the encounter could itself be the basis for Fourth Amendment liability." *Id.*

Because caselaw in this Circuit does not clearly establish that an officer may be liable under the Fourth Amendment solely for his pre-seizure conduct that led to the encounter, and the Plaintiffs do not dispute that DeShawn actively resisted the officers, the Defendants are entitled to qualified immunity on the excessive force claim. There is, likewise, no basis to proceed to a jury on the Plaintiffs' claim that the Defendants are liable for failing to intervene in these

circumstances.

However, even if DeShawn does not have an independent cause of action for excessive force, the amount of force used against him may be pertinent to the damages he incurred for other constitutional violations. The Seventh Circuit has said that "when an illegal arrest sets off a chain of indignities inflicted on the hapless victim, including offensive physical touchings that would be privileged if the arrest were lawful, she is entitled to obtain damages for these indignities whether or not they are independent violations of the Constitution." *Herzog v. Vill. of Winnetka, Ill.*, 309 F.3d 1041, 1044 (7th Cir. 2002). This is because "they are foreseeable consequences of the illegal arrest, and the ordinary rules of tort causation apply to constitutional tort suits." *Id.*

### 3.     *Formal Arrest of DeShawn For Resisting Arrest and Battery*

The Complaint alleges that the officers arrested DeShawn in violation of his right to be secure in his person from unreasonable seizure under the Fourth Amendment. In the Defendants' Motion for Summary Judgment, they note that the initial seizure was the result of mistakenly believing that DeShawn was Jones. After they realized DeShawn's true identity, he was then "briefly" arrested for battery on an officer and resisting arrest. (Mem. in Support 6, ECF No. 36-1.)

The Fourth Amendment guarantees the right to be free from arrest without probable cause. *D.Z. v. Buell*, — F.3d —, No. 14-1490, 2015 WL 4652778, at *4 (7th Cir. Aug. 6, 2015) (citing *Baker v. McCollan*, 443 U.S. 137 (1979)). "Probable cause to arrest is an absolute defense to any claim against police officers under § 1983 for wrongful arrest." *Wagner v. Washington*

*Cnty.*, 493 F.3d 833, 836 (7th Cir. 2007). A police officer has probable cause if, at the time of the arrest, the facts and circumstances within the officer's knowledge are sufficient to warrant a prudent person in believing that the suspect has committed an offense. *Id.* Where probable cause is lacking with respect to an arrest, an officer is nevertheless entitled to qualified immunity if his belief that he had probable cause was an objectively reasonable belief. *D.Z.*, 2015 WL 4652778, at *4 (citing *Humphrey v. Staszak*, 148 F.3d 719, 726 (7th Cir. 1998)). This is known as "'arguable' probable cause." *Id.*

According to the Defendants, DeShawn attacked them, which is battery upon an officer, and he appeared to be resisting arrest. (Defs.' Mem. 9, ECF No. 36-1.) In Indiana, resisting law enforcement is a Class A misdemeanor if a person "knowingly or intentionally . . . forcibly resists, obstructs, or interferes with a law enforcement officer or a person assisting the officer while the officer is lawfully engaged in the execution of the officer's duties." Ind. Code § 35-44.1-3-1. At the time of the events in question, the rule in Indiana was that a private citizen could not "use force in resisting a peaceful arrest by an individual who he knows, or has reason to know, is a police officer performing his duties regardless of whether the arrest in question is lawful or unlawful." *Casselman v. State*, 472 N.E. 2d 1310, 1315 (Ind. 1985); *see also Shoultz v. State*, 735 N.E.2d 818, 823 (Ind. Ct. App. 2000). However, it was also true that when an officer unlawfully enters a residence to make an arrest, he is not "lawfully engaged in the execution of his duties as a law enforcement officer." *Adkisson v. State*, 728 N.E.2d 175, 178 (Ind. Ct. App. 2000). Additionally, nothing in the facts suggests that DeShawn knew, or should have known, that the men in his room in the middle of the night were police officers. Accordingly, the Defendant did not have arguable probable cause to arrest DeShawn for resisting arrest.

Likewise, it is unclear whether, under the facts and circumstances known to the Defendants, they would have reasonable grounds to believe that DeShawn had committed the criminal offense of battery or whether, instead, he was justified by statute in using force to protect himself against persons who were using force against him. "A person is justified in using reasonable force against any other person to protect the person or a third person from what the person reasonably believes to be the imminent use of unlawful force." Ind. Code § 35-41-3-2(c); *cf. Cupello v. State*, 27 N.E.3d 1122, 1132 (Ind. Ct. App. 2015) (applying a different subsection of the use of force statute to overturn a conviction for battery on a law enforcement officer where the officer had unlawfully entered the suspect's apartment and resisted the suspect's attempts to close the door on the officer, thus providing a reasonable belief that force was necessary to terminate the unlawful entry into his apartment). When the Defendants arrested DeShawn, they were already aware that he was not the person they were looking for and had simply been asleep in his bed when they tried to seize him. There is no indication in the record that the Defendants identified themselves as police officers when DeShawn began resisting.[1] Thus, the Defendants had no reason to believe that DeShawn was not simply using reasonable force to protect himself against unknown individuals who were attacking him in the middle of the night.

Because the Defendants have not shown that the undisputed facts support arguable probable cause to arrest DeShawn, his Fourth Amendment false arrest claim should be decided by a jury.

---

[1] Even if they had identified themselves as police officers, the same statute provided, in July 2012, that "[a] person is justified in using reasonable force against a public servant if the person reasonably believes the force is necessary to: (1) protect the person or a third person from what the person reasonably believes to be the imminent use of unlawful force." Ind. Code § 35-41-3-2(i)(1).

**4.**     *Invasion of Privacy*

The Plaintiffs allege in their fourth cause of action that the Defendants violated their First Amendment right to privacy when they informed the media that the officers had entered the home because a violent crime had been committed and the suspect was inside the house. The Plaintiffs appear to be alleging that some or all of the Defendants personally went to local media. However, nowhere in the Complaint do they identify which Defendant took this action. Granting a Motion to Dismiss, the Court has already dismissed the claims in the Plaintiff's fourth cause of action as against Defendants South Bend, Buttigieg, and Hurley.

The Defendant officers have not moved for summary judgment on the First Amendment claim. Normally, this would mean that the Plaintiffs were not yet required to defend the claim. However, given the lack of any factual allegations suggesting that the Defendant officers made any statements to the media, the claim fails to plausibly suggest the possibility of relief against them. Additionally, this Court previously directed the Plaintiffs to file "a status of the case setting forth the discrete claims they intend to pursue to trial, including which Defendants are being sued for each particular claim." (1-27-15 Opinion & Order 7, ECF No. 34.) The Plaintiffs' Status of the Case Report [ECF No. 35] does not acknowledge any First Amendment claim.

Based on the foregoing, the Court finds that the Complaint does not state a First Amendment violation against the officers, and that the Plaintiffs have not pursued a First Amendment claim against the officers or given them any reason to believe one was being pursued. Accordingly, the fourth cause of action is dismissed.

**5.** ***Trespass, Battery, False Arrest, False Imprisonment, Negligence, Negligent Supervision, and Assault***

The Plaintiffs Complaint includes claims for trespass, battery, false arrest, false imprisonment, negligence, negligent supervision, and assault, yet their Memorandum in Opposition to the Officers' Motion for Summary Judgment mentions only trespass and battery—in the following heading: "Qualified Immunity/excessive force/ITCA immunity/Trespass/Battery." The text under the heading does not include any citation to state law, or any analysis of state law. The Plaintiffs did not include any state claims in the Status of the Case Report filed on February 27, 2015.

For their part, the Defendants assert immunity under subsection (8) of the Indiana Tort Claims Act. *See* Ind. Code § 34-13-3-3(8). According to this subsection, "[a] governmental entity or an employee acting within the scope of the employee's employment is not liable if a loss results from" the "enforcement of . . . a law." *Id.* However, immunity does not apply if the "act of enforcement constitutes false arrest or false imprisonment." *Id.*. The Plaintiffs have not attempted to explain why the Defendants' actions should not fall within the ITCA's immunity provision. Even though the heading in their Memorandum indicates that the text will address ITCA immunity, the Plaintiffs do not actually include any discussion of law enforcement immunity under Indiana Code § 34–13–3–3(8), relying instead on a previous discussion regarding qualified immunity in the context of § 1983 claims.

The law enforcement immunity section of the ITCA does not immunize the Defendants from the Plaintiffs' claims, under Indiana law, for false arrest or false imprisonment. *See Hogue v. City of Fort Wayne*, 599 F. Supp. 2d 1009 (N.D. Ind. 2009); *see also Thomas v. Brinker*, No. 1:09-CV-01516-TWP, 2011 WL 1157622, at *6 (S.D. Ind. Mar. 28, 2011) (stating that "even

where an employee is acting within the scope of his or her employment, a plaintiff may still bring state law claims of false arrest, false imprisonment, or excessive force"). Additionally, the Defendants do not seek immunity for battery, arguing instead that their actions were brought on by DeShawn's "provocation," as defined by Indiana Code. *See* Ind. Code § 35-42-2-3 (making it a Class C infraction to "recklessly, knowingly, or intentionally engage[ ] in conduct that is likely to provoke a reasonable person to commit battery").

Based on the foregoing, the Court finds that no immunity applies to the Plaintiffs' claims for false arrest, false imprisonment, and battery. Moreover, there are triable issues of fact surrounding these claims that must be decided by a jury.

### B.      Plaintiffs' Motion to Strike Paragraph

The Plaintiffs have filed a Motion [ECF No. 39] to strike a sentence contained within the Defendants' Reply brief. The sentence at issue is that the Defendants were "informed that the woman inside the house, presumably Jones' mother, was uncooperative and constantly changing her story." (Motion 1.) The Plaintiffs argue that this statement is "wildly inaccurate" and "scandalous," and should therefore be stricken pursuant to Federal Rule of Civil Procedure 12(f). They assert that there is no evidence that police contacted Vivian Franklin before they knocked on her door, or that she was uncooperative or changing her story.

The Court denies the Plaintiffs' Motion. First, Rule 12(f) applies to pleadings, and a brief filed in connection with a motion for summary judgment is not a pleading. *See* Fed. R. Civ. P. 7(a) (listing the pleadings that are allowed). Second, the Court does not read the Defendants' statement to mean, or be intended to mean, that dispatch actually talked to Vivian Jones. The

implication of the statement, particularly in light of the entire record, is that dispatch told the Defendants that a female occupant of the house was contacted and was being uncooperative. The fact that dispatch called the wrong number does not change the facts the dispatch officer relayed to the Defendants, or the inferences they drew from this information. The Court assures the Plaintiffs that it did not, in ruling on the Defendants' Motion for Summary Judgment, consider it an established fact that dispatch spoke to Vivian Franklin before the Defendants knocked on the Plaintiffs' front door.

## CONCLUSION

For the reasons set forth above, the Court GRANTS IN PART and DENIES IN PART the Motion for Summary Judgment [ECF No. 36] filed by Defendants Eric Mentz, Michael Stuk, and Aaron Knepper, and DENIES the Plaintiffs' Motion to Strike Paragraph [ECF No. 39]. Further, the Plaintiff's claim for Invasion of Privacy is DISMISSED. Still pending are the Plaintiffs' claims for unlawful entry and seizure under the Fourth Amendment and claims for false arrest, false imprisonment, and battery under state law.

SO ORDERED on September 3, 2015.

 s/ Theresa L. Springmann
THERESA L. SPRINGMANN
UNITED STATES DISTRICT COURT
FORT WAYNE DIVISION